# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————

№ 13-CV-00031 (JFB)

———————————

JESSE GUERRA,

Petitioner,

VERSUS

BRIAN FISHER,

Respondent.

———————————

**MEMORANDUM AND ORDER**
December 17, 2013

———————————

JOSEPH F. BIANCO, District Judge:

Jesse Guerra ("Petitioner" or "Guerra") petitions this Court for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his conviction in state court. On October 11, 2006, following a jury trial, Petitioner was convicted of one count of assault in the second degree, N.Y. Penal Law § 120.05(2); one count of menacing in the second degree, N.Y. Penal Law § 265.02(1); and criminal possession of a weapon (chukka sticks) in the third degree, N.Y. Penal Law § 120.14(1).[1] As a second time violent felony offender, Petitioner was sentenced to six years in prison and five years of post-release supervision for assault in the second degree. Petitioner was also sentenced to an indeterminate term of two to four years for criminal possession of a weapon in the third degree, and a definite sentence of one year for

menacing in the second degree. These sentences are running concurrently and, thus, Petitioner is serving an aggregate sentence of six years' imprisonment.

In the instant petition, Petitioner raises two issues: (1) ineffective assistance of trial counsel, and (2) the trial court's use of an improperly coercive *Allen* charge. For the reasons set forth herein, the Court concludes that Petitioner has not demonstrated any basis for habeas relief.

## I. BACKGROUND

### A. Facts

The Court has adduced the following facts from the instant petition and the underlying record.

---

[1] An additional conviction for criminal possession of a weapon (billy club) in the third degree was dismissed, without objection by the People, upon Petitioner's motion made pursuant to New York Criminal Procedure Law § 330.30.

## 1. The First Confrontation

On December 17, 2005, Petitioner invited Rachel Pietroforte ("Pietroforte"), Justine Pabon ("Pabon"), and Pabon's sister Vanessa Santos ("Santos") to Monahan's, a bar near Baldwin, New York, for drinks and to "hang out." (Tr. 291–92, 294–95.)[2] Pietroforte and Pabon were dating and lived together in an apartment in Baldwin. (Tr. 80, 211.) Santos was staying with Pietroforte and Pabon for a few days. (Tr. 211.)

At approximately 9:30 p.m. that night, Pietroforte, Pabon, and Santos went to Monahan's and waited for Petitioner. (Tr. 295.) When Petitioner did not arrive, Santos called him. (Tr. 82, 213, 239, 295.) A woman claiming to be Petitioner's girlfriend answered the phone, yelling obscenities at Santos. (Tr. 83, 86, 141, 215, 295, 297.)

After the phone call, Santos and Pietroforte went across the street from Monahan's to use the restroom. (Tr. 88, 297–98.) On their way back to Monahan's, Pietroforte and Santos saw Petitioner's car, with a woman sitting alone on the passenger's side. (Tr. 89–90, 298–99.) They approached the woman, asked her to roll down her window, and Santos talked to the woman. (Tr. 89, 299.)

Santos said, "I don't know if I spoke to you, but I'm Vanessa." (Tr. 299.) The woman in the car became "hostile" and "argumentative." (Tr. 89–90, 299.) Santos tried to explain that she was "not 'romantic'" with Petitioner, but the woman and Santos began hitting each other. (Tr. 89–90, 142, 299–300.) Pietroforte also hit the woman in the car. (Tr. 90, 143, 216–17, 300.)

Pabon and Petitioner walked out of Monahan's and saw the altercation between the woman, Pietroforte, and Santos. (Tr. 216–17, 251, 301.) Petitioner yelled and ran at Pietroforte, grabbed her around her neck, and held her against himself. (Tr. 90–92, 216–18, 301–04.) Pabon—beer bottle in hand—told Petitioner to release Pietroforte, but Petitioner told Pabon to put down the beer bottle. (Tr. 91, 218–19, 305.) Petitioner then let go of Pietroforte, pushed her, and got into his car. (Tr. 94, 219, 305.) Petitioner backed his car up within two feet of Pietroforte, Pabon, and Santos, and "screeched" out of the parking lot. (Tr. 94–95, 219–20, 305–06.)

After Petitioner drove away, Pietroforte, Pabon, and Santos returned to Monahan's, where Santos received a call from Petitioner. (Tr. 306–07.) Petitioner said that the woman in the car was a "psycho," and Santos thought that everything was "straightened out." (Tr. 307.) Petitioner called again ten minutes later, and Pietroforte spoke to him. (Tr. 96, 308.) Pietroforte apologized to Petitioner, but felt that his response was "cold." (Tr. 96.)

## 2. The Second Confrontation

Pietroforte, Pabon, and Santos left the bar nearly one half hour later, stopped at a 7-Eleven, and returned to Pabon and Pietroforte's house. (Tr. 97, 220–21, 308–09.) Once there, Pabon and Pietroforte began to argue with each other because Pabon was jealous of a phone call Pietroforte was having with another woman. (Tr. 97, 221–23, 309–10.) Santos was on the phone with a friend during the argument but heard Pietroforte and Pabon speaking. (Tr. 309–10.) In response to the argument, Pietroforte hung up with her friend, got her jacket and a cigarette, and walked outside. (Tr. 98, 223.) As Pietroforte

---

[2] The following facts are derived from the trial transcript ("Tr."). The trial took place from October 5, 2006 through October 11, 2006.

walked up the block to the Boston Gardens bar, Pabon followed her nearly all the way to the bar. (Tr. 98–99, 223–24.) Pabon walked between cars so as to go unnoticed, turning around when Pietroforte was almost at the bar. (Tr. 223–24.)

Pietroforte was smoking a cigarette and on the phone in the Boston Gardens parking lot when she saw Petitioner and his car. (Tr. 98–101.) Petitioner had a gun in his hand, approached Pietroforte, said, "Hey sweetheart," and pointed the gun at Pietroforte. (Tr. 101, 111–12.) Pietroforte said, "I'm sorry," and tried to hang up the phone so she could call Pabon. (Tr. 101.) Petitioner knocked her to the ground before Pietroforte could call Pabon, kicked her, and pointed the gun at her face. (Tr. 101–04.)

As she was in a fetal position, Pietroforte heard a gunshot over her head, and Petitioner hit Pietroforte in the head with the gun handle. (Tr. 105, 113.) Pietroforte began to bleed, but ran into the bar as Petitioner walked back to his car. (Tr. 105–06.) Pietroforte—covered in blood—screamed, "He tried to shoot me. He tried to shoot me." (Tr. 114.) Theresa Caporale ("Caporale"), a patron at the bar that night, had someone call the police, tried to calm Pietroforte down, took Pietroforte's cell phone, and wiped the blood from Pietroforte's face. (Tr. 114, 206–07.)

Pabon, who had walked back toward her house, heard a loud bang from the direction of the bar. (Tr. 224.) Santos, who was still at the house, also heard the bang. (Tr. 311.) Yelling, Pabon ran back to the bar. (Tr. 224.) Santos tried to follow her, but was stopped at the street corner. (Tr. 311.) As Pabon approached the bar, she saw Petitioner's car leaving the parking lot. (Tr. 228.) Once inside the bar, Pabon saw Caporale cleaning blood off Pietroforte's head. (Tr. 229, 312.)

Pabon spoke to Pietroforte when she arrived at the bar, and Pietroforte told Pabon that Petitioner had tried to shoot her. (Tr. 230.) The police arrived shortly thereafter, and Pabon told them about hearing a gunshot, seeing a car pulling out, and seeing Pietroforte inside the bar. (Tr. 231.) Pabon then went back to her house to get Santos. (Tr. 231.) When they returned to the bar, Santos told the police where Petitioner lived and what car he drove. (Tr. 313.) Santos then accompanied the police to Petitioner's house, but there was no answer when they arrived. (Tr. 313–14.)

Meanwhile, Catherine Chiang ("Chiang"), a medical technician, had arrived to find Pietroforte crying hysterically, with a one-inch wound on her forehead. (Tr. 70.) Chiang treated the wound in the ambulance and eventually brought Pietroforte to the hospital. (Tr. 70–74, 115.) While in the ambulance, Pietroforte talked to a police officer and identified Petitioner as her attacker. (Tr. 115.) Chiang thought the wound was a jagged wound, caused by blunt force rather than by a sharp object. (Tr. 73.) Pietroforte received fifteen stiches and developed a scar on her forehead. (Tr. 116.)

3. The Police Search

On December 18, 2005, Detective Robert Brzeski ("Brzeski") and Detective Messe ("Messe") went to Village Avenue and South Street in Baldwin, where they found a silver car in the road with the ignition on and the seat completely in the "down position." (Tr. 354–56.) The car was unoccupied and the radio was on. (Tr. 355.)

Brzeski and Messe proceeded to 678 Garfield Place, Baldwin, which was about one-half mile away. (Tr. 356.) Paula Doran ("Doran") answered the door and led Brzeski and Messe down a flight of stairs to an apartment. (Tr. 356–57.) After Brzeski and

Messe identified themselves and asked to speak with him, Petitioner let the detectives into his apartment. (Tr. 358.)

As he entered the apartment, Brzeski saw chukka sticks and a police baton on a windowsill. (Tr. 358.) Petitioner led Brzeski and Messe to the living room, where Petitioner sat on the couch, fidgeting. (Tr. 360.) Brzeski and Messe, who had both been standing in the living room, immediately put handcuffs on Petitioner and recited his rights. (Tr. 360, 368–69.) After he was informed of his *Miranda* rights, Petitioner was willing to talk to Brzeski. (Tr. 368–69.) Petitioner said that he parked the car in front of his house at 1:00 a.m. and had "no idea" why his car was in a different location. (Tr. 369.) Petitioner said that he had no knowledge of the December 17, 2005 assault. (Tr. 369.)

### B. Procedural History

### 1. State Court Proceedings

### a. Pre-trial Proceedings

On December 19, 2005, Petitioner, represented by Arthur Shaw, Esq., was released on $10,000 cash bail. (Aff. of Jesse Guerra in Supp. of 440.10 Mot., *People v. Guerra*, Ind. No. 632N-06 (N.Y. Sup. Ct. Apr. 11, 2010) ("Guerra Aff.") ¶ 4.)

On January 19, 2006, Petitioner entered into a retainer agreement with The Law Offices of Anthony A. Capetola. (Def.'s Notice of Mot. to Vacate J., *People v. Guerra*, Ind. No. 632N-06 (N.Y. Sup. Ct. Feb. 28, 2010).) The agreement included a handwritten clause providing for "$10,000.00 bail money to be paid as bonus if case results in not guilty result." (*Id.*) Donald T. Rollock, Esq. ("Rollock") prepared the agreement—including the handwritten contingency fee—under the direction of Anthony Capetola. (Aff. of

Donald T. Rollock in Resp. to Def.'s Mot. to Vacate J., *People v. Guerra*, Ind. No. 632N-06 (N.Y. Sup. Ct. May 5, 2010) ("Rollock Aff.") ¶¶ 3–4.) Rollock left Capetola's firm in the spring of 2006, but continued to represent Petitioner without entering into any other retainer agreement. (*Id.* ¶ 5.)

By an indictment returned on March 22, 2006, Petitioner was charged with assault in the second degree, three counts of criminal possession of a weapon in the third degree, and menacing in the second degree. (Decision & Order, *People v. Guerra*, Ind. No. 632N-06 (N.Y. Sup. Ct. Jul. 16, 2010).)

Before trial, Rollock made a motion to suppress the chukka sticks found in Petitioner's apartment, which the court denied after holding a hearing. (Rollock Aff. ¶ 7.)

### b. Trial and Sentencing

Petitioner proceeded to trial by jury on October 5, 2006. The prosecution presented seven witnesses throughout the course of the trial. At the trial, Detective Steven Markakis testified that no ballistic evidence was found at the scene. (Tr. 57–58.) No gun was ever found in connection with the case. (Tr. 57, 375.)

On cross-examination, Pietroforte admitted that she did not tell the police that she tried to "beat up" the passenger in Petitioner's car with Santos. (Tr. 145, 149.) Pietroforte also said that she did not tell police or the grand jury that Petitioner tried to back his car up into Pietroforte and Santos before he "screeched" out of the parking lot. (Tr. 150.) Additionally, police appeared at Monahan's after the first confrontation to deal with a separate matter, and Pietroforte did not tell those officers about Petitioner choking her. (Tr. 153, 201.) Pietroforte also said that Pabon was "pretty mad" about

Pietroforte's phone conversation with another woman. (Tr. 169.) Pietroforte admitted that she was not sure when she originally saw Petitioner before the second confrontation, or how exactly she was assaulted. (Tr. 171–77.)

Pabon, on her cross-examination, said that she was jealous and upset with Pietroforte about her phone call with another woman. (Tr. 283.) Pabon also admitted that she never re-entered the house after following Pietroforte to the bar, and that she had not yet spoken to Santos when she heard the bang. (Tr. 284–86.) On her cross-examination, Santos admitted that Pabon left the house shortly after the argument with Pietroforte, and she did not see Pabon again until after hearing the bang. (Tr. 332–33.) During Brzeski's cross-examination, Brzeski stated that he was not aware that a witness outside the bar during the second confrontation had never heard a gunshot. (Tr. 392.) Brzeski also admitted that, during the search of Petitioner's house, the chukka sticks and billy club were found on the shelf of a radiator, not on the windowsill, as mentioned in the crime report. (Tr. 388–89.)

Petitioner did not testify at trial. (Tr. 418.) During his summation, Rollock highlighted the possibility that Pietroforte, Pabon, and Santos concocted a story about what happened after the fight between Pietroforte and Pabon. (Tr. 422.) Rollock put forth an argument about mistaken identity. He argued that if Pietroforte went back to the bar after her fight with Pabon by chance, then Petitioner would not have known that Pietroforte would be there. (Tr. 430–31.) Instead, Rollock suggested that Pabon was the one who actually assaulted Pietroforte after their argument. (Tr. 431–34.) Rollock argued that Pabon's jealously, the witnesses' inconsistent statements about the confrontations, and Pabon's actions after her argument with Pietroforte suggested that the

accusations against Petitioner were a cover for a domestic violence dispute. (Tr. 434–37.)

Rollock also mentioned that there were no marks on Pietroforte's neck after Petitioner grabbed her during the first confrontation. (Tr. 429.) He noted that there was no evidence that Petitioner owned the chukka sticks, and that a friend could have left them there. (Tr. 440.)

At first, the jury returned a partial verdict. The jury found Petitioner guilty of menacing in the second degree and two counts of criminal possession of a weapon in the third degree (chukka sticks, billy club). (Tr. 535.) The jury was deadlocked ten to two, however, on the counts of assault in the second degree and criminal possession of a weapon (handgun). (Tr. 530.) Over Rollock's objection, Judge Kase accepted the partial verdict and allowed the jury to go back and continue deliberations on the remaining counts. (Tr. 531–33.) Judge Kase specified that he was not giving an *Allen* charge but was asking them to "reconsider all of their arguments." (Tr. 531.)

Rollock then moved to set aside the verdict for criminal possession of a billy club. (Tr. 543.) The charge for the billy club described the object as a wooden weapon, but the billy club at issue in the case was metal. (Tr. 543.) Judge Kase reserved decision on the objection. (Tr. 545.)

The jury then provided another note, which read:

> Count one, while we are unanimous about the charge of an assault guilty, we are still divided 10-2 about the assault being with a gun. And then under count two, we remain deadlocked 10-2. This is based upon a belief by two jurors that Miss

Pietroforte's testimony regarding the gun was not convincing. (Tr. 548.)

In response to the note, the judge gave a supplemental instruction to the jury, which included the following *Allen* charge:

I'm going to ask you to go back again, and its eminently desirable, if you reasonably can, you agree on a verdict. For the parties involved the case is an important one, and its presentation to you has involved expense to both sides. If you fail to agree upon a verdict, the case will have to be tried before another jury selected in the same manner and from the same sources that you were chosen. There is no reason, again, to believe the case will ever be submitted to a jury more competent to decide it.

Of course, by pointing out to you the desirability of you reaching a verdict, the Court is not suggesting to you that you surrender your conscientious convictions of what is truth and of the weight and effect of the evidence.

It does, however, wish to call your attention that in most cases absolute certainty cannot be expected, and that while each of you must decide the case for yourself beyond a reasonable doubt and not merely the acquiescence and the conclusion of your fellow jurors, you should examine the questions submitted to you with candor and frankness and with proper deference to and regardless of each other. It is your duty, after full deliberation and

consideration of all the evidence, to agree upon a verdict if you can do so without violating your individual judgment and your conscience.

I ask you to go back downstairs again and deliberate. Find out what issues are bothering the two of you and deliberate. I'm going to discharge you. You're going to go home tonight, and I will bring you back tomorrow, if I think it's appropriate. So let's go forward. Let's see if we can resolve this matter.

(Tr. 550–52.) Rollock's objection to the charge was overruled. (Tr. 552–53, 558.)

The jury returned a guilty verdict for assault in the second degree, and a not guilty verdict for possession of a weapon in the third degree. (Tr. 555.) Rollock noted that the verdicts were inconsistent because the alleged item used in the assault was a handgun, but Petitioner was acquitted of criminal possession of a handgun. Judge Kase asked for motion papers on the inconsistent verdict issue, as well as on the criminal possession of a billy club. (Tr. 557.)

Following trial, Petitioner's motion to dismiss the criminal possession of a weapon (billy club) in the third degree was granted without objection pursuant to New York Criminal Procedure Law § 330.30. (Resp't Br. ii.)[3]

Petitioner was sentenced on April 23, 2007 to six years in prison and five years of post-release supervision for assault in the second degree; an indeterminate term of two to four years for criminal possession of a weapon in the third degree; and a definite sentence of one year for menacing in the

---

[3] "Resp't Br." refers to the memorandum of law filed before this Court by Respondent on February 14, 2013.

second degree, with all sentences to be served concurrently. (Appellant's Br. & App. at 9, *People v. Guerra*, Ind. No. 632N-06 (N.Y. App. Div. May 15, 2008).)

### c. Direct Appeal

Represented by new counsel, Petitioner appealed his conviction to the Appellate Division, Second Department ("Appellate Division"), raising four issues: (1) the verdict was against the weight of the evidence; (2) the verdict was repugnant; (3) the court erred when it accepted a partial verdict; and (4) the court incorrectly instructed the jurors concerning their responsibility to deliberate. (*See generally* Appellant's Br. & App., *People v. Guerra*, Ind. No. 632N-06 (N.Y. App. Div. May 15, 2008).)

On March 3, 2009, the Appellate Division affirmed the conviction. The court determined that the verdict was neither against the weight of the evidence nor was it repugnant. *People v. Guerra*, 60 A.D.3d 692 (2d Dept. 2009). The court concluded also that the "defendant's remaining contentions do not require reversal." *Id.*

Petitioner next sought leave to appeal to the New York Court of Appeals, asking for a review of the trial court's charge to the jury, an explanation of the Appellate Division's holding, and review of a conflict between the ruling and New York Criminal Procedure Law § 470.05(2). (Pet. 2.)[4] The New York Court of Appeals denied Petitioner leave to appeal on June 24, 2009, *People v. Guerra*, 12 N.Y.3d 915 (2009), and denied Petitioner's application for reconsideration on October 1, 2009, *People v. Guerra*, 13 N.Y.3d 836 (2009). Petitioner did not petition

the United States Supreme Court for a writ of certiorari.

### d. Collateral Attack in State Court

In April 2009, while Petitioner was serving his sentence in the Woodbourne Correctional Facility, he read an article in *Newsday* that discussed the illegality of contingency fees in criminal cases. (Guerra Aff. ¶ 13; *see* Ann Givens, *He Admits He Killed His Wife*, Newsday, Mar. 26, 2009, http://www.newsday.com/news/he-admits-he-killed-his-wife-1.765920.) Petitioner says that he learned that contingency fees for criminal cases are illegal after reading this article. (*Id.* ¶ 14.)

Proceeding *pro se*, Petitioner sought to vacate his conviction pursuant to New York Criminal Procedure Law § 440.10. (*See* Def.'s Notice of Mot. to Vacate J., *People v. Guerra*, Ind. No. 632N-06 (N.Y. Sup. Ct. Feb. 28, 2010).) Petitioner argued that the contingency fee created a conflict of interest by allowing his attorney to pursue an "all or nothing" trial strategy. (Pet. 3.) Petitioner claimed that the contingency fee gave his attorney an incentive to refrain from requesting a lesser included offense to be submitted to the jury. (Guerra Aff. ¶ 22.)

On July 16, 2010, the New York State Supreme Court, Nassau County, denied the motion. (Decision & Order, *People v. Guerra*, Ind. No. 632N-06 (N.Y. Sup. Ct. Jul. 16, 2010).) The court concluded that although contingency fees are "improper . . . the mere existence of such an agreement in and of itself is insufficient to prove that the defendant's right to effective counsel has been violated." (*Id.* at 3.) The court determined that Petitioner's right to meaningful representation was not

---

[4] "Pet." refers to Guerra's petition filed in this case. The Court cites to the page numbers assigned by ECF.

diminished, nor was Rollock's effectiveness substantially diminished at trial. (*Id.* at 5.) The court further concluded that Rollock's strategy was reasonable given the evidence presented in the case, that the request for a lesser included offense would have conflicted with the pursued strategy, and that Petitioner's denial of guilt was consistent with the defense Rollock used. (*Id.* at 4.)

Petitioner then filed a motion to renew and reargue, claiming that Rollock had left Capetola's firm later than the spring of 2006, and requesting documentation and a hearing to try and prove when Rollock departed the firm. (Aff. of Jesse Guerra in Supp. of Mot. to Renew, Re-argue, & Appeal Order Den. 440.10 Relief at 5, *People v. Guerra*, Ind. No. 632N-06 (N.Y. Sup. Ct. Aug. 25, 2010).) Petitioner contended that he was informed of Rollock's departure from Capetola's firm in the fall of 2006. (*Id.* at 9.) Petitioner claimed that he felt pushed to accept a plea before he was told that Rollock had left Capetola's firm. (*Id.* at 9–10.) Petitioner did not wish to accept the plea, and claimed that after he rejected the offer, Rollock made several comments about collecting the contingency fee should Petitioner be acquitted. (*Id.* at 10–11.)

The court denied Petitioner's motion to renew and re-argue on December 3, 2010. (Decision & Order, *People v. Guerra*, Ind. No. 632N-06 (N.Y. Sup. Ct. Dec. 3, 2010).) The court did not discern any indication that Rollock's departure from Capetola's firm affected his strategy, and concluded instead that the defense pursued was consistent with Petitioner's claims of innocence. (*Id.* at 3.) Further, the court noted that requesting a lesser included offense would have been inconsistent with the strategy Rollock pursued. (*Id.*)

The Appellate Division denied Petitioner permission to appeal the denial of his post-

judgment motion on January 20, 2011. (Resp't Br. iv.) The Appellate Division also denied Petitioner permission to appeal the order denying renewal and re-argument on September 20, 2012. (*Id.* at ii.)

### 2. The Instant Petition

Petitioner filed a *pro se* Petition for Writ of Habeas Corpus on January 9, 2013. The petition raises two issues. First, Petitioner argues that he was denied effective assistance of counsel because the contingency fee created a conflict of interest that adversely affected the way Rollock handled the case. (Pet. 6.) Second, Petitioner claims he was denied his right to a fair trial because the trial court judge's final instruction to the jury isolated the two holdout jurors. (*Id.*) Respondent filed a memorandum of law in opposition to the petition on February 14, 2013. The Court has fully considered the submissions and arguments of the parties.

## II. STANDARD OF REVIEW

To determine whether a petitioner is entitled to a writ of habeas corpus, a federal court must apply the standard of review set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which provides, in relevant part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "'Clearly established Federal law'" is comprised of "'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

A decision is "contrary to" clearly established federal law, as determined by the Supreme Court, "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412–13. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* at 413.

AEDPA establishes a deferential standard of review: "'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.'" *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Williams*, 529 U.S. at 411). Additionally, while "'[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be

limited to state court decisions so far off the mark as to suggest judicial incompetence.'" *Id.* (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)). Finally, "if the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed findings of fact . . . are reviewed *de novo*.'" *Dolphy v. Mantello*, 552 F.3d 236, 238 (2d Cir. 2009) (quoting *Spears v. Greiner*, 459 F.3d 200, 203 (2d Cir. 2006)).

III. DISCUSSION

For the reasons discussed below, the Court denies Petitioner habeas relief because both of his claims are without merit.

A. Ineffective Assistance of Counsel

Petitioner claims that the contingency fee agreement created a conflict of interest that denied him the right to effective assistance of counsel. (Pet. 5.) In particular, Petitioner claims that the contingency fee caused Rollock not to request a lesser included offense instruction, in his pursuit of an "all-or-nothing trial strategy." (Pet. 3.) For the reasons set forth below, the Court determines that Petitioner's claim is without merit.

1. Legal Standard

The law governing habeas relief from a state conviction based on ineffective assistance of counsel is well established. In general, to demonstrate ineffective assistance of counsel, a petitioner must establish (1) that his attorney's conduct fell below an objective standard of reasonableness; and (2) that, but for this deficient conduct, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). However, "when a criminal defendant claims that defense counsel was 'burdened by an actual conflict of interest,' this warrants a 'limited presumption of prejudice.'" *Torres*

*v. Donnelly*, 554 F.3d 322, 325 (2d Cir. 2009) (quoting *Strickland*, 466 U.S. at 692). Specifically, to establish an ineffective assistance of counsel claim based on defense counsel's actual conflict of interest, a petitioner must establish that "(a) counsel actively represented conflicting interests, and (b) such conflict adversely affected his lawyer's performance." *United States v. Feyrer*, 333 F.3d 110, 116 (2d Cir. 2003); *see Strickland*, 466 U.S. at 692; *Cuyler v. Sullivan*, 446 U.S. 335, 348, 350 (1980).

In *Winkler v. Keane*, the Second Circuit held that contingency fees create an actual conflict of interest because they discourage attorneys from seeking plea agreements or "put[ting] forth mitigating defenses that would result in conviction of a lesser included offense." 7 F.3d 304, 307–08 (2d Cir. 1993). Because contingency fees create an actual conflict of interest, the use of a contingency fee amounts to ineffective assistance of counsel where a petitioner can show that the contingency fee "adversely affected" his lawyer's performance. *Id.* at 308. To determine if a failure to take certain actions adversely affected an attorney's performance, the Second Circuit has adopted a two-part test.

> [A defendant first] must demonstrate that some plausible alternative defense strategy or tactic might have been pursued. He need not show that the defense would necessarily have been successful if it had been used, but that it possessed sufficient substance to be a viable alternative. Second, he must establish that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.

*Id.* at 309 (quoting *United States v. Gambino*, 864 F.2d 1064, 1070 (3rd Cir. 1988)).

## 2. Application

Petitioner argues the contingency fee adversely affected Rollock's performance in that it discouraged Rollock from requesting an instruction on assault in the third degree— a lesser included offense of assault in the second degree. (Pet. 3, 5.) Petitioner maintains that the contingency fee agreement caused his attorney to seek an "all or nothing" trial strategy that severely prejudiced Petitioner. (*Id.* at 3.) He also contends that his counsel made verbal references about the bonus, and that counsel has since attempted to distance himself from the contingency fee agreement. (*Id.* 4.)

Respondent argues that counsel's decision not to request a charge for assault in the third degree was part of a reasonable trial strategy, given the evidence presented at trial and Petitioner's denial of any involvement in the crimes charged. (Resp't Br. 7.) Respondent notes that, during Rollock's opening and summation, he argued that Petitioner had nothing to do with the confrontations, pointed out inconsistencies in the State's case, and presented an alternative theory of domestic violence. (*Id.* at 10–12.) Respondent also argues that Rollock's strategy was reasonable in light of the evidence presented at trial and Petitioner's denial of guilt, but would not have been consistent with a request for a lesser included offense of assault in the third degree. (*Id.* at 12–13.) Additionally, Respondent notes that Rollock believed the bonus from the contingency fee agreement would go to Mr. Capetola. (*Id.* at 16.) In any event, Respondent argues that Rollock reasonably could not have expected to earn the bonus because Petitioner was almost certainly going to be convicted of possession of chukka sticks. (*Id.*) Finally, Respondent argues that Petitioner would not be entitled to a lesser included offense charge because—in light of the description of the injuries after the second

confrontation—there was no "reasonable view of the evidence that would support a finding" for assault in the third degree as opposed to assault in the second degree. (*Id.* at 16–17.)

Under the standard set forth in *Winkler*, this Court concludes that the contingency fee agreement did not adversely affect Rollock's performance. Petitioner cannot demonstrate that a plausible alternative defense strategy could have been pursued. In any event, even assuming *arguendo* that a plausible alternative defense strategy was available, he has not shown that his counsel's failure to pursue this alternative strategy resulted from the conflict of interest.

First, requesting an instruction on assault in the third degree, as a lesser included offense of assault in the second degree, was not a plausible alternative strategy. Under New York law, in order for the court to charge a lesser included offense, there must be a reasonable view of the evidence that would allow the jury to conclude that the defendant committed the lesser but not the greater offense. *Simmons v. Brown*, No. 08-CV-01425 JFB, 2011 WL 2133844, at *15 (E.D.N.Y. May 26, 2011) (citing N.Y. Crim. Proc. L. § 300.50(1)); *see People v. Scarborough*, 49 N.Y.2d 364, 368 (1980) (holding that the submission of a lesser included offense is improper if there is no reasonable view of the evidence that would allow a jury to conclude that the defendant committed the lesser but not the greater crime); *Colon v. Smith*, 723 F. Supp. 1003, 1007–08 (S.D.N.Y. 1989) ("This analysis first requires that it must be theoretically impossible to commit the greater crime without committing the lesser . . . . Second, there must be a reasonable view of the evidence in the particular case that would permit the jury to conclude that the defendant committed the lesser but not the greater offense."). Here, no reasonable view of the

evidence would allow a jury to conclude that Petitioner committed assault in the third degree, but not assault in the second degree. The characteristics of Pietroforte's wound were consistent with a wound caused by a deadly weapon or dangerous instrument (assault in the second degree). Specifically, Chiang testified that the wound on Pietroforte's forehead was one inch long (Tr. 70), and she thought that the wound was jagged, caused by blunt force rather than a sharp object (Tr. 73). There was significant testimony about how much Pietroforte bled after the assault (Tr. 71–73, 114–15, 206–07, 229, 312), and ultimately, Pietroforte received fifteen stiches and developed a scar on her forehead (Tr. 116). Finally, the testimony establishing that Petitioner hit Pietroforte also established that he hit her with the handle of a gun. (Tr. 105, 113.) Finally, even though plaintiff disputed his participation in the assault, "an argument that an acquittal was warranted does not necessitate the conclusion that a reasonable view of the evidence would have allowed the jury to convict petitioner of a lesser included offense." *Simmons*, 2011 WL 2133844, at *15. In other words, if plaintiff had committed the assault, it was assault in the second degree.

Second, even if the evidence could have reasonably supported an instruction on assault in the third degree, plaintiff has not established that the contingency fee caused Rollock not to seek such an instruction. Instead, the record shows that Rollock's decision not to request an instruction on lesser included offenses was part of his trial strategy to argue for plaintiff's innocence. *See Black v. Goord*, 419 F. Supp. 2d 365, 381–82 (W.D.N.Y. 2006) (holding that a strategy of denying guilt "practically precludes a request for an instruction on a lesser included offense") (citations omitted). Rollock adopted his trial strategy based on two factors: Petitioner's claim of innocence,

and the evidence that would be presented at trial. First, Rollock considered Petitioner's denial of involvement in the assault. (Tr. 369; Rollock Aff. ¶ 6.) However, it was clear that someone still injured Pietroforte, and Rollock developed a plausible argument based on the evidence presented at trial: Pietroforte was the victim of a domestic dispute with Pabon. There were no eyewitnesses to corroborate Pietroforte's testimony (Tr. 392), the gun used in the assault was never found (Tr. 57, 375), Pabon had a motive to hurt Pietroforte after discovering Pietroforte's phone call with another woman (Tr. 283), Pabon admitted that she was in the area of the assault (Tr. 98–99, 223–224 284–86, 332–33), and there was motive to blame Petitioner based on the first confrontation that evening (Tr. 90–92, 216–18, 301–04). (*See* Rollock Aff. ¶ 6.)

Additionally, Rollock considered the evidence of the injuries presented at trial. Chang's evaluation of Pietroforte's injuries as jagged and caused by blunt force (Tr. 73), the size of the wound (Tr. 70), the amount of stiches Pietroforte received and the resulting scar (Tr. 116), the amount of blood (Tr. 71–73, 114–15, 206–07, 229, 312), and the use of a gun during the assault (Tr. 105, 113) shaped Rollock's strategy. (Rollock Aff. ¶ 8.) It was Rollock's position that Petitioner's denial of guilt and the evidence presented at trial prevented a jury from concluding that the injuries were caused by anything else besides a dangerous instrument, and he adopted the domestic violence strategy to maintain his credibility with the jury. (Rollock Aff. ¶ 9.)

Furthermore, the court's findings on collateral review of Petitioner's conviction support Rollock's contention that he pursued his strategy independently of the contingency fee arraignment. (*See* Decision & Order 3–4, *People v. Guerra*, Ind. No. 632N-06 (N.Y. Sup. Ct. Jul. 16, 2010).) On Petitioner's

motion to reargue and renew, the court found no indication that Rollock's departure from Capetola's firm affected his strategy, and found instead that the defense pursued was consistent with Petitioner's claims of innocence. (Decision & Order 3, *People v. Guerra*, Ind. No. 632N-06 (N.Y. Sup. Ct. Dec. 3, 2010).)

Taken together, the overwhelming presence of legitimate reasons for adopting this trial strategy demonstrate that Rollock did not fail to adopt Petitioner's lesser included offense because of the contingency fee agreement. Rollock had valid, strategic reasons for not seeking a lesser included charge that should be accorded deference. *Graziano v. United States*, No. 12-CV-738 (JFB), 2013 WL 298116, at *6 (E.D.N.Y. Jan. 25, 2013) ("[A] court must apply a ''heavy measure of deference to counsel's judgments.''" (quoting *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 691))).

Accordingly, Petitioner has not demonstrated that the contingency fee adversely affected Rollock's performance. Accordingly, the Court concludes that Petitioner has failed to establish his ineffective assistance of counsel claim.

### B. Coercive Jury Charge Claim

Petitioner next claims that he was denied his right to a fair trial because the trial judge's final jury charge improperly isolated and coerced the two holdout jurors. (Pet. 6.) For the following reasons, this Court disagrees.

#### 1. Legal Standard

The law governing habeas relief from a state conviction based on coercive jury charges is also well established. "Jury instructions violate due process if they "fail[ ] to give effect to [the] requirement" that the

prosecution prove every element of the charged offense beyond a reasonable doubt." *Dell'Aera v. James*, No. 12-CV-00344 (JFB), 2012 WL 6632673, at *6 (E.D.N.Y. Dec. 20, 2012) (citing *Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (per curiam)). However, "a state prisoner making a claim of improper jury instructions faces a substantial burden." *Delvalle v. Armstrong*, 306 F.3d 1197, 1200 (2d Cir. 2002). The petitioner must establish that "'the ailing instruction by itself so infected the entire trial that the resulting conviction violate[d] due process,' not merely [that] 'the instruction is undesirable, erroneous, or even universally condemned.'" *Id.* at 1201 (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)); *see Middleton*, 541 U.S. at 437 (stating that "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation"); *Smalls v. Batista*, 191 F.3d 272, 277 (2d Cir. 1999) (A jury instruction is to be examined "as part of all the proceedings that were observed by the jury" and in light of the entire instruction; it is not to be examined "in artificial isolation.").

At issue in this case is the state court's *Allen* charge. If a jury is deadlocked, courts may give an *Allen* charge to encourage jurors to continue deliberating with the goal of reaching a verdict. *See generally Allen v. United States*, 164 U.S. 492 (1896). The Second Circuit "has consistently reaffirmed its approval of the supplementary charge to encourage a verdict in the face of an apparent deadlock." *Smalls*, 191 F.3d at 278 (citations omitted). "Whether an Allen charge is appropriate given the circumstances of a particular case hinges on whether it tends to coerce undecided jurors into reaching a verdict—that is, whether the charge encourages jurors to abandon, without any principled reason, doubts that any juror conscientiously holds as to a defendant's guilt." *United States v. Vargas-Cordon*, 733

F.3d 366, 377 (2d Cir. 2013) (citation omitted). A proper *Allen* charge thus requires a trial judge to caution jurors not to abandon their own "conscientiously held beliefs." *Smalls*, 191 F.3d at 279. Accordingly, the Second Circuit has upheld charges given in "an evenhanded, noncoercive manner," in which the court cautions that it "would prefer a unanimous verdict if accomplished 'without any juror yielding a conscientious conviction which he or she may have.'" *Id.* (quoting *United States v. Burke*, 700 F.2d 70, 80 (2d Cir. 1983)). The duration between an instruction and the rendering of a jury verdict may be probative of the coercive effect of a trial judge's instructions. *Burke*, 700 F.2d at 80.

### 2. Application

Petitioner argues that the position of the holdout jurors was known and articulated, and that those two jurors were isolated by the trial judge's final instructions. (Pet. 7.) On this basis, Petitioner argues that the final jury charge was coercive and violated his right to a fair trial.

Respondent argues that the charge as a whole was not coercive, and was meant only to instruct the jury to determine what issues divided them and to deliberate further. (Resp't Br. 23–24.) As factual support for this claim, Respondent points to the results of the two disputed claims, one of which resulted in a conviction and the other of which resulted in an acquittal. (*Id.* at 24.) Finally, Respondent argues that addressing the jurors in an *Allen* charge is not the same thing as targeting jurors. (*Id.* at 25.)

Considering the charge at issue in light of the entire set of instructions, the Court concludes that the jury instruction provided by the trial court was not coercive. The charge at issue was given in response to two notes submitted to the judge by the jury. The

first informed the judge that the jury had reached verdicts on three of the five counts, but was still unsure about the remaining two counts. (Tr. 530.) The second note also informed the judge that the jury was still unsure about the remaining two counts. (Tr. 548.) Both notes were read aloud in front of the jury. (Tr. 534, 548.)

Before reading the first note, the trial judge informed the attorneys that he would accept a partial verdict and allow the jury to continue deliberating. (Tr. 531.) As to the remaining counts, the trial judge specified that he was not giving an *Allen* charge, but was asking them to "reconsider all of their arguments." (Tr. 531.) The judge afforded both sides the opportunity to object; the government had no objection, but Rollock did object, arguing that a partial verdict would influence the juror's deliberations on the remaining charges. (Tr. 531–34.) Over Rollock's objection, the trial judge accepted the partial verdict and allowed the jury to go back and continue deliberations on the remaining counts. (Tr. 531–33.)

After accepting the partial verdict, the trial judge reminded the jury that they needed to reach a unanimous verdict, but that the process to get there would be difficult. (Tr. 536.) The trial judge emphasized that he was not "asking any juror to violate his or her conscience or to abandon his or her best judgment." (Tr. 537.) He asked them to keep an open mind, be flexible, and make a decision based only on the evidence. (Tr. 537–38.) In consideration of the instructions given throughout the case, this response addressed the jury's issue on the deadlocked counts without prejudicing Petitioner in any way.

The second note stated that the jury was sure there was an assault, but it was unsure if the assault occurred with a gun. (Tr. 548.) Additionally, the note said that, as to

possession of a handgun, two jurors believed "Pietroforte's testimony regarding the gun was not convincing." (Tr. 548.) The instructions on count one were read back to the jury, including the definition of a dangerous instrument as "any instrument, article or substance which, under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing death or serious physical injury; that is, serious or protracted disfigurement." (Tr. 549.) As to count two, the trial judge said that Petitioner must have knowingly possessed a handgun with the unlawful intent to use it on another. (Tr. 550.)

Petitioner claims that the conclusion of the *Allen* charge targeted the holdout jurors. This portion of the *Allen* charge stated:

> I ask you to go back downstairs and deliberate. Find out what issues are bothering the two of you and deliberate. I'm going to discharge you. You're going to go home tonight, and I will bring you back tomorrow, if I think it's appropriate. So let's go forward. Let's see if we can resolve this matter.

(Tr. 552.)

As a threshold matter, the Court notes that "it is generally accepted that '[t]he mere fact that the jury has made known its division to the court, without more, is not grounds for a mistrial or a bar to the court giving the *Allen* charge.'" *United States v. Mejia*, 356 F.3d 470, 477 (2d Cir. 2004) (quoting *United States v. Tanios*, 82 F.3d 98, 101 (5th Cir. 1996)); *see also United States v. Banks*, 29 F. App'x 276, 288 (6th Cir. 2002) ("*Allen* charges have generally been upheld where the jury has disclosed a split *sua sponte* and the instructions have not targeted the minority."); *Jackson v. Phillips*, No. 03 Civ. 6987 (DLC) (RLE), 2006 WL 6864908, at *7

(S.D.N.Y. Apr. 11, 2006), *report & recommendation adopted*, 2006 WL 2930202 (S.D.N.Y. Oct. 11, 2006) (rejecting habeas claim where *Allen* charge was given after jury made known its division and identified the lone dissenter). When giving an *Allen* charge, a court should not specifically target minority jurors. *See Lowenfield v. Phelps*, 484 U.S. 231, 237–38 (1988). However, even when an instruction is given that is directed at the minority jurors in some way, such instruction does not necessarily deprive the defendant of a fair trial. *See, e.g.*, *United States v. Levit*, 39 F. App'x 97, 105 (6th Cir. 2002) (instruction directed at one juror who had expressed her inability to arrive at a verdict was not coercive or prejudicial). Instead, the language of the *Allen* charge must be considered "'in its context and under all the circumstances.'" *Lowenfield*, 484 U.S. at 237 (quoting *Jenkins v. United States*, 380 U.S. 445, 446 (1965) (per curiam)); *accord United States v. Crispo*, 306 F.3d 71, 77 (2d Cir. 2002).

Here, although the final portion of the *Allen* charge does reference the holdout jurors (*i.e.*, "the two of you"), that reference must be viewed in the context of the entire instruction. More specifically, that portion of the charge was not discussing the issue of changing votes; it simply made reference to finding out what the issues were and deliberating. Other than this brief reference at the end of the instruction to "the two," the rest of the instruction was addressed to the jury as a whole. Thus, the instruction was not, as a whole, targeting the holdout jurors. The fact that the instruction did not specifically instruct the majority of the jurors to consider the opinions of the minority does not make the instruction a basis for habeas relief. As the Second Circuit explained in rejecting a similar argument:

> [Appellant] further insists that the jury should have been instructed that

the majority had an obligation to review its position . . . .

> We have never held that the trial court must specifically inform the jury that the majority must consider the arguments and the opinions of those in the minority. The brief language used by the trial court, other than the entire quote from *Allen*, was directed to each juror, not just those designated the majority or the minority. All jurors were instructed to consider the views of the other jurors without abandoning their own conscientious opinions.

*United States v. Melendez*, 60 F.3d 41, 52 (2d Cir. 1995), *vacated on other grounds by Colon v. United States*, 516 U.S. 1105 (1996); *accord Vargas-Cordon*, 733 F.3d at 378.

Moreover, even if this instruction could be construed as "singling out" holdout jurors, it was not done in such a way as to warrant habeas relief. In other words, that reference, taken in the context of the entire charge, is not so coercive so as to infect the entire trial. *See, e.g.*, *Smalls*, 191 F.3d at 277; *Dell'Aera*, 2012 WL 6632673, at *6. Throughout the charges, the trial judge instructed the individual jurors to maintain their conscientiously held beliefs. (Tr. 467, 537, 538, 551–52.) In the paragraphs preceding the disputed language, the trial judge stated, "[T]he Court is not suggesting to you that you surrender your conscientious convictions of what is truth and of the weight and effect of the evidence." (Tr. 551.) The totality of the language reflects an evenhanded, non-coercive instruction concerned with reaching a unanimous verdict without violating an individual juror's convictions or abandoning any doubts they had regarding Petitioner's guilt. *See Smalls*, 191 F.3d at 279.

15

Petitioner has failed to meet his substantial burden to satisfy a claim for improper jury instructions. Petitioner has not shown that the jury instruction so infected the trial that he suffered a due process violation. Taken in light of the entire instruction, the charge did not violate Petitioner's right to a fair trial. The judge was entitled to give an *Allen* charge based on the deadlock conveyed in the notes from the jury. The charge was not coercive and did not require jurors to forfeit their individually held beliefs, and does violate the established standards governing an *Allen* charge. Therefore, Petitioner has not met his substantial burden to demonstrate a claim for an improper jury instruction.

Accordingly, the Court concludes that the trial court's charge to the jury was not coercive, and Petitioner's right to a fair trial was not denied.

\* \* \*

In sum, with respect to the claims in this petition, this Court concludes that the state court determinations were not contrary to, or based on an unreasonable application of, clearly established law, nor was it an unreasonable determination of the facts in light of the state court record. Thus, the petition must be denied in its entirety.

IV. CONCLUSION

For the reasons set forth herein, this Court finds that the Petitioner has demonstrated no basis for habeas relief under 28 U.S.C. § 2254. All of Petitioner's claims are plainly without merit. Therefore, the petition for a writ of habeas corpus is denied. Because Petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue. *See* 28 U.S.C. § 2253(c)(2). The Clerk of the Court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: December 17, 2013
        Central Islip, New York

\* \* \*

Petitioner proceeds *pro se*. Respondent is represented by Kathleen M. Rice, District Attorney, Nassau County, by Judith R. Sternberg, 262 Old Country Road, Mineola, NY 11501.